Filed 9/23/13  In re Joe B. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JOE B., A Person Coming Under the Juvenile Court Law. | B245715 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTOPHER B., Defendant and Appellant. | (Los Angeles County Super. Ct. No. KC59707) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal for Defendant and Appellant.

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Christopher B. ("Father"), the presumed father of minor Joe B., appeals from the juvenile court's jurisdiction and disposition orders declaring Joe a dependent of the court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (b) and (j), and denying reunification services to Father pursuant to section 361.5, subdivision (b)(11). As to the jurisdiction order, Father argues that the evidence was insufficient to support the juvenile court's finding that Father's prior sexual and physical abuse of his stepdaughter and daughter placed Joe at substantial risk of harm. As to the disposition order, Father asserts that the juvenile court prejudicially erred in refusing to grant his request for a 30-day continuance of the disposition hearing, and in finding that Father had failed to make reasonable efforts to treat the problems that led to the prior removal of Joe's half-siblings. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Juvenile Dependency History

Joe, born in July 2012, is the one-year-old son of Father and Veronica L. (Mother). Mother was a former dependent of the juvenile court, and following her emancipation from the dependency system, she transferred to Regional Center services and housing.[2] Father has two children -- P.B. (a daughter born May 1993) and A.B. (a son born March 1996) -- from a prior relationship with Tracey P. Father also has three children -- T.B. (born September 2008), J.B. (born June 2010), and M.B. (born November 2011) -- from a current relationship with Eva H.[3]

The 1999 Case. In June 1997, Father's two children with Tracey -- P.B. and A.B. -- were removed from the custody of their parents following a failed voluntary

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Mother is not a party to this appeal.

[3]    During the current dependency case, Eva was pregnant with her fourth child by Father. The genders of Father's children with Eva are not disclosed in the record nor are they discernable from the children's names.

2

family maintenance plan. In July 1999, the juvenile court declared P.B., A.B., and Father's stepdaughter, Desiree P. (born December 1985) dependents of the court pursuant to section 300, subdivisions (a), (b), (c), (d), (g), (i), and (j). In sustaining the dependency petition, the juvenile court found that, starting in December 1995, Father had sexually abused Desiree by forcefully penetrating the child's vagina with his penis, digitally penetrating the child's vagina with his fingers, forcing the child to sit on his penis, and watching the child while she was naked. The sexual abuse of Desiree occurred on a weekly basis until the child's removal from the home in June 1997. The juvenile court further found that Father had physically abused P.B. by striking and hitting the child's body with a belt, and had sexually abused P.B. by fondling the child's vagina. Father was ordered to complete parenting education, domestic violence counseling, individual counseling to address anger management issues, and sexual abuse counseling. Father failed to reunify with P.B. and A.B., however, and his parental rights over both children were terminated in December 2002. P.B. and A.B. each received permanent placement services with P.B. entering into a legal guardianship in October 2004 and A.B. entering into an adoption in December 2004.

The 2010 Case. In July 2010, a second dependency case was filed on behalf of Father's two eldest children with Eva -- T.B. and J.B.[4] In November 2010, the juvenile court declared T.B. and J.B. dependents of the court pursuant to section 300, subdivisions (b) and (d). In the sustained petition, the juvenile court found that Father's prior sexual abuse of his stepdaughter, Desiree, endangered the health and safety of T.B. and J.B. and placed them at risk of physical and emotional harm and sexual abuse. T.B. and J.B. were placed in the home of their mother, Eva, on the condition that Father not reside in the home. Father was ordered to complete parenting education, individual counseling, and sexual abuse counseling for perpetrators. As of mid-2012, however, Father had not complied with his court-ordered services and the 2010 case remained open.

---

[4] Father's third child with Eva, M.B., was not born until November 2011.

## II. Initiation of the Current Dependency Proceedings

The current matter came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on July 19, 2012 based on a referral alleging that Mother had given birth to Joe on July 16, 2012, but appeared to be unable to care for the child because she was developmentally disabled. It was reported that Mother previously had been receiving Regional Center services, but her services had been terminated for an unknown reason. It was also reported that Mother was found to have lice and flea bites when she was admitted to the hospital for Joe's delivery. Joe remained in the hospital for about a week following his birth while receiving treatment for an infection, but he had no other known medical issues.

On July 24, 2012, the case social worker had a telephone conversation with Mother who stated that she had been friends with Father and Eva for about five years, and had been living with Father in a recreational vehicle (RV) at a residence in Carson prior to Joe's birth. Mother believed that Father and Eva were using her to take her social security disability insurance and other government assistance. Mother also reported that Father would deny her access to the RV at times and recently had threatened to beat her. Although Mother had identified Father as Joe's biological father on the child's birth certificate, she claimed that they merely were friends and never had a sexual relationship. She told the case social worker that she wanted Joe placed in temporary foster care until she could obtain stable housing and other services. Mother's obstetrician was assisting Mother in getting her Regional Center services reinstated.

The case social worker also spoke with Father over the telephone and requested a visit with him at his home. Father and Eva had visited Joe in the hospital, and Eva had indicated that they intended to take the baby home upon his discharge. Father was unwilling to schedule a visit with the DCFS, however, and stated that he worked and was busy. He reported that he did not live with Mother or in an RV, but rather lived inside the Carson home. He also denied that he was dating Eva or had any children with her, and claimed that Eva was his sister. Eva likewise told the case social worker that she was Father's half-sister and that they both lived in the Carson home. When asked about his

availability to take custody of Joe upon his release from the hospital, Father would not agree to assume responsibility for the child. He advised the case social worker to "[j]ust put my kid in the system because I'm tired of all this."

On July 30, 2012, the DCFS filed a dependency petition on behalf of Joe under section 300, subdivision (b) alleging that Mother's developmental delays rendered her unable to provide care and supervision of the child and placed him at substantial risk of harm. At the July 30, 2012 detention hearing, the juvenile court ordered that Joe be detained from Mother and Father and placed in foster care subject to the DCFS's supervision. The court ordered a paternity test for Father and granted both parents monitored visitation. The matter was set for a pretrial resolution conference on August 30, 2012 and a jurisdiction hearing on September 20, 2012.

## III.     First Amended Section 300 Petition

On August 30, 2012, the DCFS filed a first amended dependency petition on behalf of Joe under section 300, subdivisions (b) and (j). The amended petition added an allegation that two of Father's children, P.B. and A.B., had been declared dependents of the juvenile court based on jurisdictional findings of sexual abuse, physical abuse, and general neglect, and that Father had failed to comply with court-ordered services and to reunify with the children. It was further alleged that such conduct by Father endangered Joe's physical and emotional health and placed him at substantial risk of serious harm. In the notice of the hearing on the amended petition, the DCFS stated that it was recommending family reunification services be provided to Mother, but not to Father, pursuant to section 361.5, subdivision (b). At the August 30, 2012 hearing, both Father and Mother denied the allegations in the amended petition, and the juvenile court ordered that Joe remain detained in foster care. The matter was continued for a pretrial resolution conference on September 20, 2012 and a jurisdiction hearing on October 16, 2012.

5

# IV.    Jurisdiction/Disposition Report and Supplemental Reports

On August 28, 2012, the DCFS submitted its Jurisdiction/Disposition Report. The paternity test results showed that Father was Joe's biological father.  The DCFS had attempted to contact Father both in writing and over the telephone, but he had not responded to the agency's requests for an interview.  The DCFS's investigation revealed that Father had a criminal record which included prior convictions for battery and corporal injury to a spouse.  It also had been reported that both Mother and Father had developmental delays and were receiving social security disability insurance.

In her interview with the DCFS, Mother stated that she did not have any familial support to assist her in caring for Joe and she was concerned that others were only interested in taking her money.  She related that Father had sent her to stay on Skid Row when the RV was being repaired and she was pregnant with Joe, which had led to her getting lice.  Mother further confirmed that Father was not allowed to have unsupervised contact with his and Eva's children, and as a result, Father lived in the RV parked outside the paternal grandmother's Carson home while Eva and the children lived inside the home.  Mother recently had moved into her own apartment and was supporting herself with her social security disability insurance.  She also was receiving Regional Center services, including individualized parenting instruction for special needs parents. Because she had obtained her own housing, Mother wanted Joe returned to her care.

Mother had attended four visits with Joe, and Father had attended only one visit. According to the foster mother who monitored the visits, Mother had to be told how to hold, feed, and change the baby, and how to interact with him.  During one visit, Mother reportedly told the foster mother that she could not wait to get Joe home because she was buying videos for him and asked what types of videos he liked to watch.  Mother's case worker through the Regional Center explained that Mother was learning the basics of caring for a baby and was attentive and eager to learn.  The case worker believed Mother had the capacity to take care of Joe, but she would need many additional hours of parenting instruction, including supervised overnight visits.  Mother's obstetrician agreed that Mother was motivated to parent Joe and wanted to be part of his life, but she would

6

need a strong support system such as an assisted living facility that could accommodate both her and the baby. The obstetrician reported that, before Joe's birth, Father had been managing Mother's social security disability funds and giving her only $100 of her $845 monthly payments. The obstetrician had helped Mother move into a temporary shelter after Father had threatened her.

In its Jurisdiction/Disposition Report, the DCFS recommended that Joe be declared a dependent of the juvenile court based on Mother's developmental delays which the agency believed could impede her ability to safely parent Joe, and on Father's history of sexual and physical abuse which had led to the removal of his other children. The DCFS recommended that Mother be provided with family reunification services, including hands-on parenting education for special needs parents, continued Regional Center services, and increased visitation with Joe. The DCFS recommended, however, that Father not be provided with family reunification services pursuant to section 361.5, subdivisions (b)(6), (b)(10) and (b)(11) based on his failure to reunify with P.B. and A.B. and the subsequent termination of his parental rights over those children.

In a September 20, 2012 supplemental report, the DCFS informed the juvenile court that it had been scheduled to interview Father on September 14, 2012. However, on the day of the interview, Eva contacted the dependency investigator to report that Father had to be hospitalized because of an allergic reaction. The investigator had requested that the interview be rescheduled, but Father had not responded to the request. At the September 20, 2012 pretrial resolution conference, the juvenile court continued the matter for a further conference on October 16, 2012 and ordered that the DCFS prepare a supplemental report following its interview with Father. The jurisdiction hearing was continued to October 31, 2012.

In an October 16, 2012 interim review report, the DCFS stated that the interview with Father had been rescheduled for October 9, 2012 at the agency's office. However, Father did not attend that appointment and instead called the dependency investigator to question why he needed to be interviewed at all. Father also claimed that he missed the last appointment because Eva was in the hospital for their baby, which was inconsistent

7

with Eva's claim that Father was in the hospital for an allergic reaction. When the investigator proposed that the interview be rescheduled for the morning of October 11, Father responded that he "doesn't rise early for nothing." Father continued to be argumentative with the investigator and refused to reschedule the interview for a mutually-convenient time. The case social worker for the 2010 case involving Father's children with Eva similarly reported that Father had only made himself available to meet with her on one occasion, and that the matter was set for a further review hearing because Eva had stated she would move back in with Father once the case was closed. The DCFS continued to recommend that Father not be offered reunification services under section 361.5, subdivision (b). At the October 16, 2012 pretrial resolution conference, the matter was continued for a contested hearing on October 31, 2012. The DCFS was ordered to make another attempt to interview Father.

In an October 31, 2012 supplemental report, the DCFS informed the juvenile court that it had interviewed Father on October 26, 2012. During the interview, Father denied the prior allegations that he had sexually and physically abused his stepdaughter and daughter. He claimed that his stepdaughter's family had forced her to lie about the abuse, and he maintained that he never touched the child in a sexually inappropriate manner. He also denied that the juvenile court in the 1999 case had found the allegations of sexual and physical abuse to be true. In addition, Father insisted that he had not taken advantage of Mother's developmental disabilities and instead had tried to help her by providing her with a place to stay and assistance in managing her money.

Father further reported during the interview that he already had completed his court-ordered services through the Salvation Army, but they no longer had his records. He did, however, provide the DCFS with a letter from Lewis Counseling Services dated February 14, 2012 which stated as follows: "Mr. Christopher [B.] has completed an agreed upon twenty (20) counseling sessions through this agency. The focus of Mr. [B's] counseling has been on sexual offender behavior, decision-making and appropriate adult relationships. Mr. [B.] has openly expressed his thoughts and feelings. We have discussed the negative consequences of antisocial and deviant sexual behaviors. Mr. [B.]

8

is reportedly in the armed forces and seems to gain much meaning from his service to his country. Overall, Mr. [B.] has been both cooperative and on time for his sessions." In its supplemental report, the DCFS maintained its recommendation that reunification services not be offered to Father pursuant to section 361.5, subdivision (b). However, the agency also recommended that, if the juvenile court decided to order such services, Father should be required to complete parenting education, a mental health assessment, and individual counseling to address case issues.

## V. Jurisdiction and Disposition Hearing

The contested jurisdiction and disposition hearing was held on October 31, 2012. The juvenile court admitted into evidence the reports prepared by the DCFS, letters from Mother's service providers showing her progress with her Regional Center services, paternity-related documents supporting Father's claim of parentage, and the letter from Lewis Counseling Services regarding Father's counseling sessions. Father testified on his own behalf at the hearing. According to Father's testimony, he was the biological father of Joe and wanted to reunify with him. Father believed that he was capable of taking care of his children and that he did not have any mental disabilities that would interfere with his ability to care for Joe. He admitted that he had failed to reunify with two of his children, P.B. and A.B., in the 1999 case, which had led to the removal of two of his other children, T.B. and J.B., in the 2010 case. Father testified that he timely had completed his court-ordered services in the 1999 case, but that his records of completion had not been accepted. He denied any knowledge that the court previously had found that he had sexually abused a child. Father also claimed that he voluntarily served in the United States Coast Guard and was a commanding officer in that service.

The juvenile court found true the allegations against both Mother and Father and sustained the first amended petition under section 300, subdivisions (b) and (j). The court also found that Father was the presumed father of Joe based on his voluntary declaration of paternity. Following the jurisdictional findings, Father's counsel requested a 30-day continuance for a contested disposition hearing based on the DCFS's recommendation

9

that Father not be offered reunification services. The court denied the request for a continuance on the ground that the matter had been set for a contested adjudication and a contested disposition that day.

After hearing the argument of counsel as to disposition, the juvenile court declared Joe a dependent of the court pursuant to section 300, subdivisions (b) and (j), and ordered that he be removed from the custody of both parents and suitably placed by the DCFS. The court ordered family reunification services for Mother, including parenting instruction, participation in Regional Center supportive living services, and monitored visitation with Joe subject to the DCFS's discretion to liberalize. The court denied family reunification services for Father pursuant to section 361.5, subdivision (b)(11) based on a finding that Father had not made a reasonable effort to treat the problems that had led to the removal of his other children. In making its ruling, the court reasoned as follows: "As to the father, this is the father's fifth child. And although the court is unaware at what stage the proceedings are in [Department] 420 for two of the children, two of the children are already in a legal guardianship, and father has not completed or addressed the reasons why the children were removed from his care." Following the jurisdiction and disposition orders, Father filed a timely notice of appeal.

## DISCUSSION

### I. Jurisdictional Findings Based on Father's Prior Sexual and Physical Abuse

Father first challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional findings based on his history of sexual and physical abuse. He specifically contends that the DCFS failed to present sufficient evidence to establish that the juvenile court previously had sustained a dependency petition alleging that Father had sexually and physically abused two of his children. He also claims that the evidence was insufficient to support a finding that Father's alleged prior sexual and physical abuse of his daughter and stepdaughter posed a substantial risk of harm to his infant son, Joe.

10

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Substantial evidence is "evidence that is reasonable, credible, and of solid value." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212; *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

As Father acknowledges, "a jurisdictional finding against one parent is good against both." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Stated otherwise, a child "is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent. [Citation.]" (*Ibid.*; see also *In re Alexis* (2009) 171 Cal.App.4th 438, 451 ["When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence."].) Here, the jurisdictional finding as to Mother, which is not challenged on appeal, constitutes a sufficient and independent basis for dependency jurisdiction over Joe without regard to any findings related to Father.

## II.    Denial of Father's Request for a Continuance

Father next contends that the juvenile court erred when it denied his request for a continuance of the disposition hearing. He argues that a 30-day continuance was required under section 358, subdivision (a)(3) because the DCFS had recommended that Father be denied family reunification services. He also asserts that the denial of a continuance violated his due process rights by precluding him from presenting an adequate defense.

The juvenile dependency system requires that petitions brought under section 300 be heard and decided rapidly. (*Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1241.) By mandating accelerated proceedings, the dependency system "seeks to keep to a minimum the amount of potential detriment to a minor resulting from court delay. [Citation.]" (*Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 193.) Continuances in dependency cases are therefore discouraged and "should be difficult to obtain." (*Jeff M. v. Superior Court*, *supra*, at p. 1242.) The denial of a request for a continuance will not be overturned on appeal absent a showing of an abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180; *In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811.) "Discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice. [Citation.]" (*In re Karla C.*, *supra*, at p. 180.)

Section 358, subdivision (a), the statute on which Father relies, provides that prior to making a dispositional finding for a dependent child, "the court may continue the hearing on its own motion, the motion of the parent, or the motion of the child, as follows:  [¶] . . . [¶] (3) If the social worker is alleging that subdivision (b) of Section 361.5 is applicable, the court shall continue the proceedings for a period not to exceed 30 days. The social worker shall notify each parent of the content of subdivision (b) of Section 361.5 and shall inform each parent that if the court does not order reunification a permanency planning hearing will be held, and that his or her parental rights may be terminated within the timeframes specified by law." (§ 358, subd. (a)(3).)

On the other hand, section 352, subdivision (b) provides, in pertinent part, that "[n]otwithstanding any other provision of law, if a minor has been removed from the

parents' or guardians' custody, no continuance shall be granted that would result in the dispositional hearing, held pursuant to Section 361, being completed longer than 60 days after the hearing at which the minor was ordered removed or detained, unless the court finds that there are exceptional circumstances requiring such a continuance." (§ 352, subd. (b); see also *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604-605 ["Absent 'exceptional circumstances,' if a child is detained the dispositional hearing must be completed within 60 days of the detention hearing."].) In this case, the original section 300 petition was filed and Joe was ordered detained on July 30, 2012. Following several continuances, the petition was finally adjudicated on October 31, 2012, more than 60 days after the detention hearing. Consequently, the juvenile court could only grant a continuance of the disposition hearing upon a showing of exceptional circumstances. Father, however, made no such showing.

In asking the juvenile court for a continuance, Father's attorney merely expressed her belief that Father was entitled to have the disposition hearing held 30 days after the adjudication of the section 300 petition because the DCFS was recommending that Father not be offered family reunification services. When reminded by the juvenile court that the matter had been calendared for a contested adjudication and a contested disposition that day, the attorney responded that proceeding with the disposition would be over Father's objection, but failed to offer any evidence of extraordinary circumstances warranting a continuance.

On appeal, Father asserts that a continuance was necessary because the DCFS did not disclose that Father had participated in sex abuse counseling until it filed its supplemental report the day of the jurisdiction hearing, and did not attempt to conduct any follow-up investigation concerning Father's progress with such services. However, it was Father who created the delay by repeatedly refusing to meet with the DCFS about the pending case. He did not appear for his scheduled interviews on September 14 and October 9, 2012, and refused to reschedule the interview for the morning of October 11, 2012 on the basis that he "doesn't rise early for nothing." The DCFS was finally able to meet with Father a few days before the continued jurisdiction hearing, at which time he

13

presented the agency with the letter dated February 14, 2012 from Lewis Counseling Services. Given Father's persistent lack of cooperation with the DCFS and his own last-minute disclosure of the letter, we see no merit to his claim that the juvenile court should have ordered the DCFS to further investigate the contents of the letter before proceeding with the disposition.

Moreover, even if we assume that section 358 governed Father's request for a continuance of the disposition hearing, any error committed by the juvenile court in denying the request was harmless. The purpose of section 358, subdivision (a)(3) is to ensure that a parent is timely notified prior to the disposition hearing that the social services agency is recommending that the parent be denied family reunification services pursuant to section 361.5, subdivision (b). Here, the DCFS expressly stated in its Jurisdiction/Disposition Report, and in each of its supplemental reports, that it was recommending that Father not be offered reunification services under section 361.5, subdivisions (b)(10) and (b)(11) based his failure to comply with his court-ordered services and to reunify with his children, P.B. and A.B., each of whom received permanent placement services. Considering that the Jurisdiction/Disposition Report was filed more than 60 days before the October 31, 2012 disposition hearing and that the February 14, 2012 letter from Lewis Counseling Services had been in Father's possession prior to that time, Father cannot show that the juvenile court's refusal to continue the disposition hearing caused him to suffer any prejudice.

For similar reasons, we reject Father's argument that the denial of his request for a continuance constituted a violation of his due process rights. Due process in dependency proceedings requires that the parent be provided with notice of the proceedings and an opportunity to be heard. (*In re Matthew P.* (1999) 71 Cal.App.4th 841, 851; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412-413.) As discussed, Father had adequate notice of the jurisdiction and disposition hearing and the DCFS's recommendation that Father be denied reunification services under section 361.5, subdivision (b). At the contested hearing, the juvenile court offered Father an opportunity to bring forward witnesses and other evidence concerning his efforts to address the problems that led to

14

the removal of his older children, including his participation in court-ordered counseling. Any failure by Father to present additional evidence to support his position was not because the juvenile court denied him the opportunity to offer evidence, but because Father chose not to do so. The juvenile court accordingly did not abuse its discretion or violate due process in denying Father's request for a continuance.

## III.    Denial of Family Reunification Services to Father

Father also challenges the sufficiency of the evidence supporting the portion of the juvenile court's disposition order denying him family reunification services. He contends that the DCFS failed to prove by clear and convincing evidence that he had not made reasonable efforts to address the problems that led to the removal of his older children. He further claims that the juvenile court failed to consider the evidence presented by Father which supported a finding that he had in fact made such reasonable efforts.

"'As a general rule, reunification services are offered to parents whose children are removed from their custody in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.]" (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.) "Section 361.5, subdivision (b), however, sets forth certain exceptions – called reunification bypass provisions – to this 'general mandate of providing reunification services.' [Citation.] These enumerated 'bypass' provisions are the specific instances in which the Legislature has recognized 'that it may be fruitless to provide reunification services,' and once the court has found one of these specific instances applicable, 'the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.' [Citation.]" (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) An order denying reunification services under section 361.5, subdivision (b) is reviewed on appeal for substantial evidence. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216; *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)

In this case, the juvenile court denied reunification services to Father under section 361.5, subdivision (b)(11) which states, in relevant part, as follows: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, . . . [¶] (11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." Father does not dispute that the first prong of section 361.5, subdivision (b)(11) was satisfied in that he failed to reunify with P.B. and A.B. in the 1999 case which resulted in the termination of his parental rights over both children. Father's argument instead is directed at the second prong, and specifically, whether the juvenile court properly found, by clear and convincing evidence, that Father had not made a reasonable effort to treat the problems underlying the prior dependency cases.

"The 'no reasonable effort' clause provides a means of mitigating a harsh rule that would allow the court to deny services based only upon the parent's prior failure to reunify with the child's sibling 'when the parent had in fact, in the meantime, worked toward correcting the underlying problems.' [Citation.]" (*Cheryl P. v. Superior Court*, *supra*, 139 Cal.App.4th at p. 97.) "The reasonable effort requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation.] 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted."' [Citations.] However, '[t]he "reasonable effort to treat" standard "is not synonymous with 'cure.'"' [Citation.]" (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.) In evaluating whether the efforts made by a parent are reasonable, the juvenile court may "consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts. . . . And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made." (*Ibid.*)

Considering the totality of the record in this case, there was substantial evidence to support the juvenile court's finding that Father had failed to make reasonable efforts to address the problems that led to the removal of his other children. To counter the evidence presented by the DCFS that he had not complied with his court-ordered services, Father primarily relied on the letter from Lewis Counseling Services which reflected that, as of February 2012, he had completed 20 counseling sessions that were focused on "sexual offender behavior, decision-making and appropriate adult relationships." However, as of the October 2012 jurisdiction and disposition hearing, Father continued to deny that he had sexually or physically abused his daughter or stepdaughter, and insisted that he never touched any child in a sexually inappropriate manner. He also continued to deny that the juvenile court in the 1999 case had found the prior sexual and physical abuse allegations to be true in declaring P.B. and A.B. dependents of the court.

Given Father's refusal to acknowledge his prior acts of sexual and physical abuse, or to even admit that there were prior jurisdictional findings based on such abuse, the juvenile court reasonably could conclude that Father's participation in counseling was not a reasonable effort to address the problems of abuse. The record also reflects that, apart from his participation in sex abuse counseling, Father had not made a reasonable effort to comply with his other court-ordered services. While Father testified that he had completed his services in the past and that his records of completion had been rejected for an unknown reason by either the DCFS or the court in the prior case, the juvenile court reasonably could have found that Father's testimony on this matter was not credible in light of the contrary evidence. Under these circumstances, the juvenile court's denial of reunification services to Father was supported by substantial evidence.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.


ZELON, J.

We concur:


PERLUSS, P. J.


WOODS, J.